UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| GINA D'AMORE; MID-ATLANTIC INTERPRETING GROUP, INC., <br><br> Plaintiffs, <br><br> v. <br><br> SMALL BUSINESS ADMINISTRATION, <br><br> Defendant. | Case No. 21-cv-1505 (CRC) |

## MEMORANDUM OPINION

Plaintiffs Mid-Atlantic Interpreting Group ("MAIG") and its CEO, Gina D'Amore, bring claims against the Small Business Administration ("SBA") under section 504 of the Rehabilitation Act of 1973. They allege that SBA failed to provide Ms. D'Amore, who is deaf, effective sign language interpretation in connection with two SBA-sponsored programs. Following discovery, both sides moved for summary judgment. Finding no genuine factual dispute that Ms. D'Amore was provided meaningful access to both programs, the Court will grant summary judgment for SBA.

I.  Background

The following facts appear from the parties' respective statements of undisputed facts to be uncontested, unless otherwise indicated. Gina D'Amore is the owner and CEO of MAIG, which provides American Sign Language ("ASL") interpretation services to various federal agencies.[1] Pls.' Counter-Statement Material Facts ("Pls.' CSMF") ¶¶ 4–5, 7. In March 2019, SBA invited D'Amore to participate in its 2019 Emerging Leaders Program, an executive-level

---

[1] D'Amore and MAIG are both plaintiffs, but the Court will refer to them collectively as "D'Amore."

training course for selected small business owners.  Def.'s Statement Material Facts ("Def.'s SMF") ¶ 25.  Separately, in June 2020, SBA offered D'Amore an opportunity to access two webinars on COVID-19-related issues.  Id. ¶ 107.

    A.  <u>SBA's 2019 Emerging Leaders Program</u>

The 2019 Emerging Leaders Program consisted of an introductory kick-off session, followed by thirteen three-hour long classes, held bi-weekly.  Id. ¶ 20.  Participants would also spend over 60 hours in self-directed mentoring groups over the course of the program.  Id. ¶ 21.  Soon after D'Amore was accepted into the program, she was contacted by a manager in SBA's Baltimore office, Tonia McCoy, seeking details on her need for interpretive services.  Id. ¶ 28.  D'Amore requested two American Sign Language ("ASL") interpreters, certified by the Registry of Interpreters for the Deaf ("RID"), and provided SBA a list of preferred interpreters.  Id. ¶¶ 29–30.  SBA communicated D'Amore's request for RID-certified interpreters to its vendor, HIS Sign.  Def.'s SMF, Ex. 5 at SBA00036.  And HIS Sign told SBA, "it looks like we have two RID interpreters available" before SBA accepted HIS Sign's quote.  Def.'s SMF, Ex. 6 at SBA00037, Ex. 7 at SBA00046.  HIS Sign later informed SBA that it was able to secure two interpreters—Alexandra Day and Carol Tipton—for all but the introductory kick-off session of the program.  Def.'s SMF ¶ 49.  For that session, which took place on April 11, 2019 at SBA's Baltimore office, HIS Sign could confirm only Ms. Day's availability.  Id. ¶¶ 49–50; Def.'s SMF, Ex. 10 at SBA00055, Ex. 11 at SBA00065.  Neither Day nor Tipton was on D'Amore's list of preferred interpreters.  See Def.'s SMF, Ex. 3 at SBA00027–00028.

The April 11 kick-off session was scheduled to begin at 3 p.m.  Def.'s SMF ¶ 47.  At 3:08, D'Amore informed McCoy by email that no interpreter had arrived.  Id. ¶ 51; Pls.' CSMF ¶ 53; Def.'s SMF, Ex. 12 at SBA00137.  McCoy replied within minutes saying that she was "on

2

the phone with HQ to find out more information." Def.'s SMF, Ex. 12 at SBA00136. Meanwhile, without an interpreter present, the program instructor delayed the start of the session. Def.'s SMF ¶ 54. D'Amore emailed McCoy again at 3:25, informing her that an interpreter still had not arrived and requesting an update. Def.'s SMF, Ex. 12 at SBA00136. By this time, according to D'Amore, participants had begun introducing themselves and describing their backgrounds. Def.'s SMF ¶ 56; Deposition of Gina D'Amore ("D'Amore Dep.") (Vol. 1) at 84:10–25. McCoy responded at 3:28 that she was "still on hold." Def.'s SMF, Ex. 12 at SBA00136. A minute later, D'Amore informed McCoy that "[t]he lady showed up very late and only one interpreter." Def.'s SMF, Ex. 13 at SBA00121. McCoy immediately replied, "I am on my way," but D'Amore insisted "I am leaving now." Id.; Def.'s SMF, Ex. 12 at SBA00136. McCoy followed up, asking if D'Amore was still in the meeting room and where the interpreter was. Def.'s SMF, Ex. 12 at SBA00136. D'Amore did not respond further. Def.'s SMF ¶ 63.

Although the dispute turns out not to be a material one, the parties strongly disagree over the identity of the interpreter who arrived for the kick-off session. As noted above, HIS Sign informed SBA prior to the session that the interpreter would be Alexandra Day. Def.'s SMF, Ex. 10 at SBA00055. And Ms. Day has submitted a sworn affidavit attesting that she arrived at the session and introduced herself to D'Amore as the interpreter, only to be dismissed when D'Amore learned that Day would be working alone. Declaration of Alexandra Day ("Day Decl.") ¶¶ 6–8. Yet, Ms. D'Amore claims to have recognized the interpreter as someone named Karen Taylor, whom she had been assigned once before. Def.'s SMF ¶¶ 60, 67; Pls.' CSMF ¶ 45. Unfortunately, discovery apparently did not reveal any other evidence corroborating either side's position.

In any case, D'Amore elaborated on her experience at the kick-off session in an email to SBA several days later. While expressing her appreciation to SBA for taking "the necessary steps to secure appropriate interpretation coverage," D'Amore claimed that the interpreter she identified as Ms. Taylor was not properly certified, had refused to voice D'Amore's concerns to the instructor, and had acted unprofessionally in a past interaction. Def.'s SMF, Ex. 14 at SBA00149. SBA disputes that account, crediting Ms. Day's sworn statement that D'Amore dismissed her when she realized a second interpreter might not be available. Def.'s SMF ¶¶ 74–78; Day Decl. ¶ 8.

In an effort to smooth the waters, SBA offered to have the instructor at the kick-off session provide D'Amore an "overview email" of the session, as well as a participant's workbook that would allow D'Amore to access an online portal before the upcoming session. Def.'s SMF, Ex. 18 at SBA00193. SBA also invited D'Amore's business partner to participate in the remainder of the program. Id. Not satisfied, D'Amore requested admission into the following year's program in 2020. Id.; Def.'s SMF Ex. 19 at SBA00228. When SBA informed D'Amore that it could not guarantee her a slot in the 2020 program, she declined to continue in the 2019 program. Def.'s SMF Ex. 19 at SBA00228. D'Amore claims she was "pressured" to leave the program because SBA refused to guarantee the provision of "qualified ASL interpreters" for the remainder of the sessions. Pls.' CSMF ¶¶ 85–86.

B. SBA's COVID-19 Training Webinars

Separately, in June 2020, SBA notified D'Amore that it would be offering two free 90-minute training webinars to assist small businesses with responding to the COVID-19 crisis. Def.'s SMF ¶ 107. The webinars consisted of narrated PowerPoint presentations with closed captioning. Def.'s SMF ¶ 109 (citing Declaration of Jason Whetsell ("Whetsell Decl.") ¶ 5).

4

The webinars did not include video presentations or an ability for viewers to interact with the presenter, but they did include a chat box and a live polling tool.  Id. ¶¶ 109–10; Def.'s SMF, Ex. 25 at SBA00289.  D'Amore reached out to SBA, noting her need for an ASL interpreter if the sessions involved an interactive element "with dialogue and attendee participation."  Def.'s SMF, Ex. 23 at SBA00274.  SBA directed D'Amore to a representative of Gabriel Enterprises, the vendor hosting the presentations, who notified her that participation in the webinar would be limited to "written questions and answers and live polling," all of which would be described in the closed captioning.  Def.'s SMF ¶ 117, Ex. 27 at SBA00302.  D'Amore responded that she would be able only to "listen and []not communicate and participate."  Def.'s SMF, Ex. 28 at SBA00309.  At her deposition, D'Amore expounded that she might have fallen behind in the program while trying to read the closed captioning.  D'Amore Dep. (Vol. 2) at 39.  SBA ultimately concluded that, although D'Amore might prefer ASL interpretation, closed captioning would be sufficient to meet her needs.  Def.'s SMF ¶ 116.  Once informed that the webinars would involve only closed captioning, D'Amore opted not to view them.  Id. ¶ 119.

D'Amore filed suit in December 2020.  She claims that SBA denied her meaningful access to the Emerging Leaders Program and the webinars in violation of section 504 of the Rehabilitation Act.[2]  The parties have completed discovery and now cross-move for summary judgment.

---

[2]  The Court previously dismissed D'Amore's claim under Section 508 of the Rehabilitation Act because, in sponsoring the two programs at issue in this case, SBA was not acting as a provider of federal funds, as required for a cause of action under Section 508.  See D'Amore v. Small Bus. Admin., No. 21-CV-01505 (CRC), 2021 WL 6753481, at *1 (D.D.C. Sept. 16, 2021).

## II. Legal Standards

### A. Summary Judgment

A court must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the "absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). At this stage, courts should view the evidence "in the light most favorable to the nonmoving party" and must "draw all reasonable inferences in favor of the nonmoving party." Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011). Non-movants cannot rely on "mere allegations" or conclusory statements to defeat summary judgment. Guillen-Perez v. District of Columbia, 415 F. Supp. 3d 50, 57 (D.D.C. 2019) (Cooper, J.) (citing Veitch v. England, 471 F.3d 124, 134 (D.C. Cir. 2006)).

On cross-motions for summary judgment, each party "must carry its own burden under the applicable legal standard." Mitchell v. Pompeo, No. 1:15-CV-1849 (KBJ), 2019 WL 1440126, at *4 (D.D.C. Mar. 31, 2019) (quoting Ehrman v. United States, 429 F. Supp. 2d 61, 67 (D.D.C. 2006)). A "cross-motion for summary judgment does not concede the factual assertions of the opposing motion." Id. (citing CEI Wash. Bureau, Inc. v. DOJ., 469 F.3d 126, 129 (D.C. Cir. 2006)).

### B. The Rehabilitation Act

Section 504 of the Rehabilitation Act prohibits federal agencies from discriminating against individuals with disabilities. See 29 U.S.C. § 794(a). Specifically, the provision provides that no individual with a disability shall be "excluded from [] participation in [or] be

denied the benefits of" federal programs.  Id.  To prove a violation of section 504, plaintiffs must show that:

> (1) they are disabled within the meaning of the Rehabilitation Act, (2) they are otherwise qualified, (3) they were excluded from, denied the benefit of, or subject to discrimination under a program or activity, and (4) the program or activity is carried out by a federal executive agency or with federal funds.

Am. Council of the Blind v. Paulson, 525 F.3d 1256, 1266 (D.C. Cir. 2008).

### III. Analysis

The parties dispute only whether D'Amore has established the third element of a section 504 violation, namely whether she was "excluded from" or "denied the benefit" of (1) the 2019 Emerging Leaders program or (2) the COVID-19 webinars.  Id.  To satisfy this element, D'Amore must show that she was denied "meaningful access" to the programs' benefits. Alexander v. Choate, 469 U.S. 287, 301 (1985).  Plaintiffs "likely . . . establish[] that they lack meaningful access" to a program where they "identify an obstacle that impedes their access." Am. Council of the Blind, 525 F.3d at 1267.  In conducting this "necessarily fact-specific" inquiry, id, courts should heed the Supreme Court's admonition that any interpretation of section 504 must "be responsive to two powerful but countervailing considerations—the need to give effect to the statutory objectives and the desire to keep § 504 within manageable bounds." Alexander, 469 U.S. at 299.  Because the Court finds D'Amore was not denied meaningful access, it grants SBA's motion for summary judgment as to both programs.

### A. 2019 Emerging Leaders Program

There is no dispute that the interpretive services SBA planned to provide D'Amore for the 2019 Emerging Leaders Program met the Rehabilitation Act's standard of meaningful access. Before the program began, SBA contracted with its vendor, HIS Sign, for D'Amore to have two ASL interpreters for the thirteen substantive sessions of the program, as well as the introductory

session. Def.'s SMF, Ex. 6 at SBA00037–00038. And, in its request to HIS Sign, SBA specifically included D'Amore's preference for two RID-certified interpreters with "strong voice and reception." Def.'s SMF, Ex. 5 at SBA00036. SBA admittedly did not meet every single one of D'Amore's requests. Specifically, it did not ask HIS Sign to hire interpreters from D'Amore's pre-approved list. Def.'s SMF, Ex. 3 at SBA00027–00028. But D'Amore does not contend that she was entitled to an interpreter of her choosing.

The actual services that SBA's vendor provided at the introductory event also met the Rehabilitation Act's standard of meaningful access. To be sure, all did not go according to plan. HIS Sign managed to book only one interpreter; the interpreter appears not to have had a RID-certification, or at least not an active one; the interpreter arrived late; and, D'Amore asserts, the interpreter refused to voice to the instructor D'Amore's comment that she was supposed to have two interpreters.[3] Def.'s SMF ¶¶ 49–60; D'Amore Dep. (Vol. 1) at 93:15–24. But these deficiencies did not deny D'Amore meaningful access either as a matter of law or under the particular facts of this case.

First, D'Amore has failed to prove that one interpreter without RID certification would have denied her meaningful access. D'Amore contends that "industry standards" and SBA's

---

[3] As discussed above, the parties still dispute the identity and conduct of the interpreter at the introductory session. D'Amore maintains that the interpreter was Karen Taylor, who she says was not RID-certified and who refused to voice some of D'Amore's concerns to the program instructor. Pls.' CSMF ¶¶ 45, 68. SBA insists that the interpreter was Alexandra Day, Def.'s SMF ¶¶ 72–78, whose RID certification D'Amore claims is expired, Pls.' CSMF ¶ 43. Because the Court finds that SBA was not required to provide a RID-certified interpreter under the circumstances and that Taylor's refusal to voice D'Amore's concerns (if true) did not deny D'Amore meaningful access to the program, the identity, RID accreditation, and disputed conduct of the interpreter are immaterial.

"own policies and procedures" required it to provide two certified interpreters.[4]  Pls.' Cross-Mot. at 8.  But, the only SBA "policies and procedures" D'Amore points to are (1) SBA's contract with another vendor and (2) an SBA policy that applies only to "employees and applicants with disabilities" and was "enacted after the date of the incidents in question."  Pls.' CSMF ¶¶ 37 & 37 n.1; Deposition of Gaye Walker ("Walker Dep."), Ex. 2 at SBA00730.  Neither is binding on the services SBA, via HIS Sign, provided D'Amore.  And, because D'Amore did not remain at the session, her claim that a single interpreter without RID certification lacked the proper competence to interpret is purely speculative.  See Cause of Action Inst. v. Off. of Mgmt. & Budget, 10 F.4th 849, 857 (D.C. Cir. 2021) ("[S]peculation . . . does not defeat summary judgment.").

Moreover, the Rehabilitation Act's standard of "meaningful access" did not require SBA to provide two RID-certified interpreters at the introductory event.  Meaningful access is not the same as "perfect communication."  Silva v. Baptist Health S. Fla., Inc., 856 F.3d 824, 835 n.7 (11th Cir. 2017).  And, consistent with the Supreme Court's instruction to balance section 504's objectives with the need to keep it "within manageable bounds," Alexander, 469 U.S. at 299, the Rehabilitation Act does not require agencies to "provide a certified ASL interpreter at every scheduled meeting with a deaf person," Hooper v. City of St. Paul, No. 17-CV-3442 (PJS/DTS), 2019 WL 4015443, at *15 (D. Minn. Aug. 26, 2019).  Instead, courts have found plaintiffs were

---

[4] Even if having two interpreters is "industry standard" for events over ninety minutes, HIS Sign had a pre-existing policy to deal with situations where only one interpreter was available.  In an email to SBA, HIS Sign attached its policy, which required a rate of time and a half for interpreters working long assignments alone.  Def.'s SMF, Ex. 7 at SBA00046.  In this case, the assigned interpreter agreed in advance to work alone for the introductory session, Def.'s SMF, Ex. 4 at SBA000675, and, at the introductory session, reiterated her willingness to work solo, Def.'s SMF ¶ 74; D'Amore Dep. (Vol. 1) at 93:8–10.

denied "meaningful access" when agencies provided no interpreter whatsoever. See, e.g., Randolph v. Rodgers, 170 F.3d 850, 858 (8th Cir. 1999) (prison provided no interpreter for inmate's disciplinary hearings). Courts have also found Rehabilitation Act violations when agencies relied on non-professional interpreters, like employees who happened to know some ASL or the deaf individual's family members. See, e.g., Pierce v. D.C., 128 F. Supp. 3d 250, 259, 279 (D.D.C. 2015) (noting that the prison "neither sought, nor found, any outside ASL interpreter"); see also Williams v. Hayman, 657 F. Supp. 2d 488, 492, 499 (D.N.J. 2008) (denying motion for summary judgment when the only interpreter provided was a "primarily self-taught" employee (cleaned up)); Wortham v. City of Benton, No. 4:19-CV-00069-KGB, 2021 WL 4150403, at *10 (E.D. Ark. Sept. 13, 2021) (denying cross motions for summary judgment when the agency relied on a woman's "minor children" and "adult friend" to interpret). While the Court does not hold that such situations are the only ones that give rise to section 504 liability in the context of interpretive services, they are a far cry from what happened here.

Second, the interpreter's late arrival did not deny D'Amore meaningful access. The interpreter arrived approximately thirty minutes late. Def.'s SMF ¶¶ 59–60; Pls.' CSMF ¶¶ 61–62. But, in response, the program instructor delayed the meeting start, and D'Amore missed at most some participant introductions. Def.'s SMF ¶¶ 54–56; D'Amore Dep. (Vol. 1) at 83:22–84:3. The small portion of the program D'Amore missed—several minutes out of a one hundred-hour program over twenty-six weeks—did not amount to the denial of meaningful access. In Loye v. County of Dakota, the Eighth Circuit rejected the notion that the absence of interpreters at two of six to eight meetings denied hearing-impaired participants meaningful access. 625 F.3d 494, 499 (8th Cir. 2010). The circuit agreed with the district court that, "considering the series of meetings as a whole, plaintiffs received effective communication." Id.

10

(cleaned up); see also id. (agreeing with district court's interpretation "for the reasons the [district] court explained"). The same is true here, especially given that, after the session, SBA tried to make up for the portion of the session D'Amore missed by having the instructor send D'Amore a summary of any content she missed. See Def.'s SMF ¶ 93.

Third, D'Amore contends that the interpreter refused to voice to the program instructor D'Amore's concern that only one interpreter had arrived. D'Amore stated in her deposition that she "want[ed] to make sure the instructor k[new] there [was] supposed to be 2 interpreters." D'Amore Dep. (Vol. 1) at 93:15–17. The interpreter, however, purportedly "wouldn't voice [D'Amore's] concern to the instructor" and told her "to shut up and sit down." Id. at 93:20–21, 94:12. If true, this behavior is concerning, but it does not amount to a denial of meaningful access. The Rehabilitation Act requires an agency to provide "meaningful access *to the benefit* that the [agency] offers." Alexander, 469 U.S. at 301 (emphasis added). Here the benefit SBA offered was the programming of the Emerging Leaders Program—in other words mentorship, entrepreneurship skills, and access to a professional network. See Def.'s SMF, Ex. 29 at SBA00013. The benefit was not the right to communicate with the instructor about a request for interpreters. See Jarzynka v. UPMC Health Sys., 2011 WL 4565612, at *4–5 (W.D. Pa. 2011) (finding a plaintiff who alleged a hospital denied him the "right to refuse treatment" had defined benefit "too broad[ly]" because the service the hospital offered was "medical services," not the absence of medical services). D'Amore does not assert, nor does the record contain evidence, that the interpreter refused to sign or voice content related to the substance of the leadership program.

Even if the "benefit" provided by SBA included the right to communicate her concerns about the interpreter, D'Amore was able to, and did, express those concerns both during and after

the introductory session. During the session, D'Amore emailed Tonia McCoy—an SBA employee who, unlike the program instructor, was involved in arranging D'Amore's interpretive services—that "only one interpreter" "showed up." Def.'s SMF, Ex. 13 at SBA00121. McCoy immediately replied that she was "on [her] way." Id. And, as she explained in a follow-up email to D'Amore, McCoy headed to the class so that they could have an "opportunity to communicate." Def.'s SMF, Ex. 13 at SBA00121. D'Amore, however, had already left the session, and McCoy did not receive further communication from her until four days later. Id. SBA then continued to create opportunities for D'Amore to air her concerns about the quality of interpretive services. The week after the introductory session, McCoy and members of SBA's Office of Diversity and Inclusion had a conference call with D'Amore. Def.'s SMF, Ex. 19 at SBA00230. During the call, D'Amore expressed her "concern about the interpreter" and SBA offered multiple options for redress.[5] Id. Thus, to the extent the interpreter failed to provide D'Amore access to a benefit she was due, SBA found alternative ways to provide D'Amore with that benefit. See Carter v. Bennett, 651 F. Supp. 1299, 1301 (D.D.C. 1987), aff'd, 840 F.2d 63 (D.C. Cir. 1988) ("The government is not obligated under the statute to provide plaintiff with every accommodation he may request, but only with reasonable accommodation. . . .").

Accordingly, SBA is entitled to summary judgment on D'Amore's claim that she was denied meaningful access to the Emerging Leaders Program.

---

[5] SBA's efforts to remedy the situation also distinguish this case from those where agencies ignored or rejected individuals' requests for interpreters. See, e.g., Randolph, 170 F.3d at 858–59 (prison officials refused "to discuss" an inmate's request for an interpreter); Robertson v. Las Animas Cnty. Sheriff's Dept., 500 F.3d 1185, 1189 (10th Cir. 2007) (detention officer "did nothing" when defendant indicated he could not hear); Wortham, 2021 WL 4150403, at *9 (police department "ignored or refused a specific request" for an interpreter).

B. <u>2020 COVID-19 Webinars</u>

The Court next turns to the two 2020 COVID-19 webinars. The question here is whether SBA's refusal to provide D'Amore with an ASL interpreter denied her meaningful access to the webinars. The Court determines it did not.

The facts are undisputed that closed captions accompanied the webinars' audio and that the webinars involved minimal attendee participation. Def.'s SMF ¶¶ 109–10 (citing Whetsell Decl. ¶ 5). The webinars consisted of PowerPoint presentations overlaid with narration that was captured using closed captioning for hearing-impaired participants. Whetsell Decl. ¶ 5. Participants did not see or directly communicate with the presenter or each other. <u>Id.</u> Instead, the opportunities for interaction were limited to participants typing either questions in a chat box or responses to polling questions, both of which were accompanied by closed captioning. <u>Id.</u>; <u>see also</u> Def.'s SMF ¶¶ 109–111, 117. Given the provision of closed captions and the limited opportunities for participation, the Court finds that SBA did not deny D'Amore meaningful access by refusing to provide her an interpreter. <u>See</u> <u>Bax v. Drs. Med. Ctr. of Modesto, Inc.</u>, 52 F.4th 858, 867 (9th Cir. 2022) (noting that hearing-impaired individuals are not entitled to "an on-site interpreter every time they ask for it"); <u>Yelapi v. DeSantis</u>, 525 F. Supp. 3d 1371, 1381 (N.D. Fla. 2021) ("There is no dispute, and the cases show, that an ASL interpreter is *not always* required.").

D'Amore, nonetheless, contends that closed captions could not provide her meaningful access to the webinars because she would experience "processing delays" translating the English language captions to ASL. D'Amore Dep. (Vol. 2) at 38:2–6. The Court will assess this contention in two parts: in reference, first, to the webinars' core content (i.e., the narration that

13

accompanied the PowerPoints) and, second, to the interactive elements (i.e., the typed questions and polling responses).

As for the core content, D'Amore does not contend that she would have missed any information as a result of delayed processing. Rather, she simply would have experienced some delay in learning the information, including if, for example, she had to rewatch the webinars. See D'Amore Dep. (Vol. 2) at 39:7–25. Indeed, as the company presenting the webinars explained to D'Amore before the events, the webinars were recorded and D'Amore could always "pause and rewind [the] sessions as needed." Def.'s SMF, Ex. 27 at SBA00302. But delay, alone, does not constitute a denial of meaningful access, at least in this situation. In Loye v. County of Dakota, a county's failure to provide interpreters at certain public meetings meant deaf residents experienced delays in learning relevant information. 625 F.3d at 499. The meetings concerned the county's response to a public health crisis—namely that mercury had contaminated individuals, homes, and vehicles, forcing residents (including deaf residents) to move to temporary housing. Id. at 495. The Eighth Circuit found that "even if at times delayed, the information communicated during the large-group meetings was not so time-sensitive that the delay denied Plaintiffs effective communication and meaningful access to the services being provided."[6] Id. at 499. Though information about COVID-19's impact on small businesses no

---

[6] In cases involving the lack of ASL interpreters at government COVID-19 briefings, some courts have found that deaf individuals were denied meaningful access because they could not read English-language captions. See, e.g., Martinez v. Cuomo, 459 F. Supp. 3d 517, 524–25 (S.D.N.Y. 2020) ("The live broadcasts with closed captioning, while perhaps accommodating deaf New Yorkers who are fully literate in English, do not accommodate Plaintiffs and other similar deaf New Yorkers who cannot read English."). Though D'Amore has explained that ASL, not English, is her first language and she sometimes does not always "have full understanding" when reading English, she acknowledged that "[she] can read it." D'Amore Dep. (Vol. 1) at 14:2–21. But cf. Martinez, 459 F. Supp. 3d at 521 ("[One plaintiff] cannot read, write, or understand English. . . . [Another plaintiff] cannot read closed captioning, transcripts, PowerPoint slides, or any other written account of [] press briefings.").

doubt was important, nothing whatsoever in the record suggests that the information was so time-sensitive that any delay D'Amore might have experienced had she viewed the webinars would have deprived her meaningful access to their core content.

The interactive elements require different analysis, but the outcome is ultimately the same. D'Amore contends that the absence of an ASL interpreter denied her the opportunity to participate in the question-and-answer and polling portions of the webinar. See D'Amore Dep. (Vol. 2) at 39:18–21. But this is pure speculation. And speculation does not raise a material issue of fact sufficient to defeat a motion for summary judgment. See Applegate v. Dobrovir, Oakes & Gebhardt, 628 F. Supp. 378, 390 (D.D.C. 1985), aff'd, 809 F.2d 930 (D.C. Cir. 1987) ("[T]he mere surmise of the plaintiff is insufficient to create a disputed issue of material fact sufficient to warrant a trial"); see also Flores v. United States, 885 F.3d 119, 122 (2d Cir. 2018) ("[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." (citation omitted)). Because D'Amore did not attend the webinars and has not provided the Court with any evidence regarding what or how much information was communicated in the chat box or polling feature, she can only speculate that she would have fallen "behind" and therefore been unable to ask "follow-up questions."[7] D'Amore Dep. (Vol. 2) at 39:8, 19. And she can only surmise that she would have had questions or that any questions she may have had would have gone unasked by other participants. Accordingly, the Court finds

---

[7] Of course, a plaintiff may decline an accommodation if she might reasonably expect that the auxiliary aid would malfunction or be ineffective. See Silva v. Baptist Health S. Fla., Inc., 856 F.3d 824, 840 (11th Cir. 2017) (holding that it would not hold against plaintiff his decision to decline an auxiliary aid because the device had malfunctioned in the past). But that was not the case here. D'Amore had no way of knowing, ex ante, whether the closed captioning would have been insufficient given the content of the interactive elements or the pace of the webinars.

that D'Amore's speculative claims do not create a genuine dispute that she was denied "meaningful access [to the webinars] as a whole."[8]  Breyer v. Pac. Univ., No. 20-35304, 2021 WL 3829966, at *1 (9th Cir. Aug. 27, 2021).  SBA is therefore entitled to summary judgment on this aspect of D'Amore's claim as well.

### C. Retaliation Claims

Next, D'Amore alleges that SBA retaliated against her filing of a complaint by (1) terminating her participation in the programs at issue and (2) failing to timely respond to her complaints.  Am. Compl. ¶ 32; Pls.' Cross-Mot. at 10.  To succeed on a retaliation claim, a plaintiff must show "that [s]he engaged in a protected activity," "the defendant took adverse action against [her]," and "a causal link [connects] the plaintiff's request for an accommodation and the adverse action."  Pierce v. District of Columbia, 128 F. Supp. 3d 250, 281 (D.D.C. 2015).

D'Amore's first retaliation theory fails with respect to each program.  First, in reference to the 2019 Emerging Leaders Program, SBA did not take an "adverse action" against D'Amore.  D'Amore claims that she was "pushed out" of the 2019 program and that her request to transfer to the 2020 program was driven by the lack of proper interpretive assistance.  Pls.' CSMF ¶¶ 85–86.  But the record paints a different picture.  As described above, SBA made repeated efforts to

---

[8] D'Amore also insists that SBA did not follow its proper procedures.  First, she claims that SBA's policy required it to provide ASL interpretation whenever requested.  Pls.' CSMF ¶ 118.  But D'Amore points to no evidence to suggest that SBA had this policy in place in 2020.  Second, D'Amore contends that SBA failed to submit her request to the Office of Diversity and Inclusion via an interpreter request form.  D'Amore offers scant evidence for this claim too, pointing to a deposition of Gaye Walker which does not establish that SBA contravened its procedures.  Walker Dep. at 51–53.  Throughout her briefing, D'Amore also styles this argument as an arbitrary-and-capricious claim.  Considering that D'Amore did not bring a claim under the Administrative Procedure Act, the Court need not engage in arbitrary-and-capricious review of agency action.

encourage D'Amore to remain in the 2019 cohort. D'Amore's SBA point of contact, Ms. McCoy, reached out to her during the introductory session, and Ms. McCoy and members of SBA's Office of Diversity and Inclusion met with D'Amore the following week. Def.'s SMF ¶¶ 53, 58, 61, 92–94. As part of that meeting, SBA provided D'Amore with several options to help her continue in the 2019 cohort, including having D'Amore's business partner attend the program, having the program instructor provide an overview of the introductory session via email, and overnighting D'Amore's participant workbook to her in time for the next session. Def.'s SMF, Ex. 18 at SBA00193. While D'Amore found these efforts unsatisfactory, they strongly undercut any notion that SBA constructively terminated D'Amore from the 2019 program.

Her webinars retaliation claim also suffers from the absence of an adverse action or a causal connection. No evidence supports D'Amore's claim that SBA "terminat[ed] [her] participation in the program[]." Am. Compl. ¶ 32. Instead, the individual running the webinars explained the accommodations available and offered to help D'Amore "register" to attend the sessions. Def.'s SMF, Ex. 28 at SBA00309. There also is nothing in the record indicating that Charles Georges—the SBA official who decided whether to grant D'Amore's request—was aware that she had earlier filed a complaint. See Def.'s SMF, Ex. 26 at SBA00296; see Duncan v. Johnson, 213 F. Supp. 3d 161, 199 (D.D.C. 2016) (finding no causation where plaintiff offered no proof that decision-maker "ever learned of plaintiff's protected activity").[9]

---

[9] Even if D'Amore had argued she was retaliated against for requesting ASL interpreters (rather than filing the administrative complaint), "the denial of a reasonable accommodation request cannot by itself constitute an adverse action supporting a claim of retaliation based on that request." Sandler v. Blinken, No. 21-cv-2226 (DLF), 2022 WL 4547557, at *9 (D.D.C. Sept. 29, 2022).

D'Amore's second theory of retaliation also fails as a matter of law. D'Amore alleges that SBA "retaliatorily fail[ed] to timely respond to [D'Amore's] complaints so as to ensure the absence of [D'Amore's] participation in the programs." Compl. ¶ 31; Pls.' Reply at 17. It is unclear what "complaints" she is referencing. But, if the "complaints" are D'Amore's original emails expressing concern about the interpretive services, SBA promptly responded to each email. See Def.'s SMF Exs. 3, 9, 12–14, 16–20 (leadership program); Def.'s SMF, Exs. 24, 27–28 (webinars). If D'Amore is referring to her administrative complaints, she filed the administrative complaint regarding the leadership program *after* she decided to withdraw. See Def.'s SMF, Ex. 19; Am. Compl. at 283–87; see also Hayslett v. Perry, 332 F. Supp. 2d 93, 98 (D.D.C. 2004) (finding plaintiff could not establish a prima facie case of retaliation as "several of the alleged retaliatory acts predate[d]" the protected activity). And D'Amore points to no evidence in the record that SBA delayed its review of her webinars complaint as retaliation for her filing the complaint. Such "unsupported and conclusory allegations . . . do not create a genuine issue for trial sufficient to withstand summary judgment." Moses v. Kerry, No. 15-5241, 2016 WL 1272943, at *1 (D.C. Cir. Feb. 8, 2016).

D. Motion to Strike

Finally, D'Amore moves to strike Alexandra Day's and Jason Whetsell's declarations. The Court will deny each motion. First, D'Amore contends that Day's declaration should be excluded under the "sham affidavit" rule, which "prohibits a party from creating a material issue of fact simply by contradicting its prior sworn testimony." United States ex rel. Landis v. Tailwind Sports Corp., 234 F. Supp. 3d 180, 193 (D.D.C. 2017) (cleaned up); Pls.' Cross-Mot. SJ at 2. D'Amore claims that Day's statement that she served as the interpreter at the kick-off session contradicts an earlier email Day sent to SBA. Pls.' Cross-Mot. at 3; Decl. of Alexandra

Day ¶ 6.  In January 2021, SBA asked Day to provide her recollection of the kick-off session.  Pls.' CSMF Ex. 9.  As more than a year had passed since the event, Day reasonably requested more details to refresh her memory, including the address of the job, the hours it spanned, and the consumer's name.  Id.  The court finds that the "sham affidavit" rule does not apply because Day's email was not "sworn testimony."  Even if it was, her latest attestation is fairly viewed as a clarification, rather than a contradiction, of her earlier statement.  Tailwind Sports Corp., 234 F. Supp. 3d at 193 (holding that a supplemental affidavit is generally admissible if it clarifies the prior sworn statement).

Next, D'Amore moves to exclude Mr. Whetsell's declaration on the grounds that it is impermissible expert opinion.  Pls.' Cross-Mot. at 4.  Whetsell is the Chief Operating Officer of Gabriel Enterprises, the vendor responsible for the 2020 COVID webinars.  Whetsell Decl. ¶ 1.  D'Amore takes issue with Whetsell's statement that "[d]ue to the technology used for these Webinars, closed captioning was deemed more appropriate to accommodate any hearing-impaired participants."  Id. ¶ 6.  The Court views this statement as merely a factual recitation of the company's decision-making and not a scientific or technical opinion.

## IV. Conclusion

For these reasons, the Court will grant SBA's motion for summary judgment, deny Plaintiffs' cross-motion for summary judgment, and deny Plaintiffs' motion to strike.

A separate Order shall accompany this memorandum opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date:    September 25, 2023